UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 9:18-CV-80225

| | | |
|---|---|---|
| RICHARD ROYS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| RIOT BLOCKCHAIN, INC., JOHN O'ROURKE, JEFFREY G. McGONEGAL and BARRY HONIG, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | <u>DEMAND FOR JURY TRIAL</u> |

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff Richard Roys, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Riot Blockchain, Inc. ("Riot" or the "Company"), Company press releases, analyst reports and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Riot securities between November 13, 2017 and February 15, 2018, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "1934 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

4.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

## THE PARTIES

5.     Plaintiff Richard Roys purchased Riot securities during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

6.     Defendant Riot (f/k/a Bioptix, Inc. ("Bioptix")) has historically operated as a biotechnology company.  In October 2017, the Company adopted the name Riot Blockchain, Inc. and embarked on a radical change in business direction, announcing that it would begin investing in and operating blockchain technologies with a particular focus on the Bitcoin and Ethereum blockchains.  Riot common stock trades on the NASDAQ Capital Market ("NASDAQ") under the symbol "RIOT."

7.     Defendant John O'Rourke ("O'Rourke") has been the Company's Chief Executive Officer ("CEO") and Chairman of the Board since November 3, 2017.  Previously, he served as a director of the Company, a position to which he was nominated by defendant Barry Honig.

8.     Defendant Jeffrey G. McGonegal ("McGonegal") served as the Company's Chief Financial Officer ("CFO") at all relevant times.

9.     Defendant Barry Honig ("Honig") through his ownership of Riot securities, influence over Riot's Board of Directors (the "Board") and top executives, including defendant O'Rourke, and continuous course of business dealings with Riot acted as a control person of the Company throughout the relevant time period as alleged herein.

10.    The defendants referenced above in ¶¶7-9 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false and misleading statements that artificially inflated the prices of Riot securities during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and

- 2 -

authority to control the contents of Riot's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e*., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

11.     Since October 2017, Riot has styled itself as a blockchain technology company. Before that time, Riot was a biotechnology company known as Bioptix that specialized in the development of veterinary and life science diagnostic tools. Bioptix was previously called Venaxis, Inc. ("Venaxis"), but changed its name to Bioptix in December 2016 following a merger with a company of that name.

12.     Defendant Honig has exercised outsized influence over the Company's business and operations since at least April 2016. Honig is an investor who specializes in buying up enough shares of microcap companies to enable him to influence company affairs and then implements changes he believes will increase share value so that he can sell his shares at a profit. Honig describes himself as a "venture capitalist who helps startups and growing businesses with corporate financing, restructuring, mergers and acquisitions, and other key strategic advice."

13.     In April 2016, Honig purchased, directly or indirectly through his investment firm GRQ Consultants, Inc., over 335,000 shares of the Company – then named Venaxis.  At the time, Honig's share purchases represented approximately 8.65% of the Company's outstanding stock.  In subsequent months, Honig steadily increased his share ownership.

14.     In September 2016, Venaxis acquired Bioptix.  Honig became an outspoken critic of the deal, calling it an "inside job" and accusing insiders of using the acquisition to entrench their interests.  Honig's significant influence over the Company compelled it to issue a formal response. The former CEO of Venaxis, Stephen Lundy ("Lundy"), issued a letter to shareholders in which he disputed Honig's characterizations of the deal, but acknowledged Honig's growing influence over the Company's affairs:  "Since [Honig] became a significant shareholder in the spring of 2016, I have met with and spoken with him on many occasions and have been open to his thoughts and ideas."

15.     By December 2016, Honig had acquired 500,000 shares of Company (now named Bioptix) common stock, representing approximately 11.1% of the Company's outstanding shares and making Honig the Company's largest shareholder.  That same month, Honig used his ownership of Bioptix shares to nominate a slate of directors to the Board, including defendant O'Rourke.  In nominating materials filed with the SEC on Form SC 14N, O'Rourke was described as a managing member of ATG Capital LLC, an investment fund focused on small and mid-cap growth companies, much like Honig's own firm, GRQ Consultants, Inc.

16.     Honig's nominations were initially opposed by Company insiders.  In response, Honig commenced legal action in Colorado state court to force a special meeting of shareholders that would allow him to remove certain members of the Board and replace them with his own nominees.

The targeted directors resigned their positions in response. In their resignation letter to Lundy, the directors acknowledged the power and influence of Honig over the Company's affairs, stating: "The members of the Board of the Company have engaged in discussions with principal shareholders of the Company subsequent to the commencement of such action, and, based on such discussions, have determined that if such special meeting were to be held, the proposals submitted by Mr. Honig would be approved by the shareholders."

17.     Following these resignations, the Company appointed defendant O'Rourke and another of Honig's nominations, Mike Dai ("Dai"), to the Board. Dai and O'Rourke were also each appointed to the Nominating and Governance, Audit and Compensation committees of the Board, forming a majority on each committee, with O'Rourke serving as Chairman of the Audit Committee and Dai serving as Chairman of the Compensation Committee. In subsequent months, Honig increased his power over the Board and the Company's management as additional non-Honig-supported directors resigned. Lundy resigned his positions as CEO and director in April 2017 and was replaced by Michael Beeghley ("Beeghley"), who at the time served as Board Chairman.

18.     After Honig cemented his domination of the Company's business and affairs, Riot embarked on a radical change in business strategy. As of August 21, 2017, Honig owned 543,000 shares of Bioptix, representing approximately 10% of Bioptix's outstanding shares. Similarly, Honig's investment firm, GRQ Consultants, Inc., owned another 30,600 Bioptix shares, while Honig's father, Alan Honig, owned 20,000 shares. An investment fund reportedly run by his brother, Jonathan Honig, Titan Multi-Strategy Fund I, Ltd., owned another approximately 10% of the Company's shares. In addition, a reported business associate of Honig, Mark Groussman

("Groussman"), owned an additional 500,000 Bioptix shares either in the accounts of his family or through his company, Melechdavid Inc.

19.     On October 3, 2017, Bioptix announced a special cash dividend of approximately $1 per share that would be paid to the Company's shareholders of record as of October 13, 2017. Honig and his associates stood to collectively receive millions of dollars in payments as a result of this dividend due to their ownership of Bioptix shares. Bioptix paid this dividend despite the fact that the Company had an accumulated deficit of over $120 million as of September 30, 2017, compared to cash and cash equivalents of only about $13 million and no significant sources of revenue. As a result, the payment of the dividend further depleted the Company's dwindling cash reserves and impaired its ability to pursue new business ventures.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS
LEADING UP TO THE CLASS PERIOD**

20.     On October 4, 2017, Bioptix issued a press release stating that it was changing its name to Riot Blockchain, Inc. and shifting its business focus to investing in and operating blockchain technologies with a particular focus on Bitcoin and Ethereum. Despite the fact that the Company had previously operated in the biotechnology sphere, and had no previous business in blockchain technologies, the press release portrayed Riot as a seasoned player in an exciting emerging technology. For example, CEO Beeghley was quoted in the press release as stating, "'At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets.'" Similarly, the press release described Riot as follows:

> Riot Blockchain Inc. (formerly Bioptix, Inc.) ***leverages its expertise and network to build and support blockchain technology companies***.[1] It is establishing

---

[1]     Emphasis has been added unless otherwise noted.

an Advisory Board with technical experience intending to become *a leading authority and supporter of blockchain and provides investment exposure to the rapidly growing blockchain ecosystem*.[2]

21.     The press release also announced that Riot had made a strategic investment in Coinsquare Ltd., "one of Canada's leading exchanges for trading digital currencies," and stated that the Company would pursue similar investments in blockchain technologies going forward.

22.     On October 5, 2017, the Company filed an "Investor Presentation" with the SEC as an exhibit to a Form 8-K.  The Investor Presentation portrayed Riot as "*part of the disruptive technology and activities revolutionizing transactions*."  It gave an overview of blockchain assets and the "$150B" market opportunity for companies such as Riot that sought to invest in blockchain technologies.  The presentation claimed Riot was a "first mover" as a "*NASDAQ listed pure play Blockchain company*" and quoted Beeghley as stating: "*At Riot Blockchain Inc. we leverage our expertise, and network, to build and support blockchain technology companies.  We provide investment exposure to the rapidly growing blockchain ecosystem*."

23.     On October 17, 2017, Riot issued a press release announcing that it had entered into a definitive purchase agreement to acquire a 52% ownership interest in Tess Inc. ("Tess"), an Ontario-based company purportedly engaged in the development of blockchain-based payment services for wholesale telecom carries.  Beeghley was quoted in the press release as stating: "'Riot Blockchain is committed to building and supporting the blockchain ecosystem . . . .  The telecom payment platform of TESS is a prime example of how blockchain-based technologies can be leveraged to disrupt

---

[2]     Representations that the Company was "leverag[ing] its expertise and network" and was positioned to be a "leading authority" in blockchain technologies that would provide investors "exposure to the rapidly growing blockchain ecosystem," or nearly identical representations, appeared in every, or nearly every, subsequent press release issued by Riot, including those issued during the Class Period and alleged to be false and/or misleading herein.

established industries.  *I believe that Riot Blockchain is poised to take advantage of this revolution in digital transactions as we see increasing adoption of blockchain protocols in our everyday lives*.'"

24.    On October 23, 2017, Riot issued a press release announcing that defendant O'Rourke had been appointed to the position of Company President.

25.    On October 27, 2017, Riot filed an updated version of its Investor Presentation with the SEC as an exhibit to a Form 8-K.  The updated presentation provided information about Riot's recent business acquisitions and revised upwards the estimated size of the Company's cryptocurrency market opportunity from $150 billion to $170 billion, stating "Cryptocurrency market value has increased from $17.7 billion to over $170 billion in 2017."   The Investor Presentation similarly stated that Riot would provide investors with "*a gateway to blockchain*" as "*one of the only Nasdaq listed companies with this focus*."

26.    On November 2, 2017, Riot issued a press release announcing that it had entered into an agreement to acquire 1,200 Bitcoin mining machines.  O'Rourke was quoted in the press release as stating, "'The acquisition positions us to launch our cryptocurrency mining operations, at a time that Bitcoin and other digital currencies are gaining increased attention and adoption . . . .  We plan to leverage the mining technology to help realize our vision of becoming *a leader in blockchain technologies*.   Mining bitcoin helps secure the bitcoin blockchain, while providing us direct exposure to accumulating bitcoin in the process.'"

27.    On November 3, 2017, Riot filed a Form 8-K which announced that the Company had appointed O'Rourke to the positions of CEO and Chairman of the Board.

28.     The statements referenced in ¶¶20, 22-23 and 25-26 were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

(a)     the Company had changed its name to Riot Blockchain, Inc. to generate investor enthusiasm and tie the Company to the recent rise in the price of cryptocurrencies, such as Bitcoin, but lacked the requisite infrastructure, fundamental business or expertise of a legitimate blockchain company or significant asset exposure to cryptocurrency markets, in order to further an insider scheme that would allow Honig and his associates to sell their Riot securities at artificially inflated prices;

(b)     Honig and other investors were effectively controlling the Company and its operations and exerting undisclosed influence over the Company's business and affairs from Honig's Florida offices to further their own interests rather than the interests of the Company's outside shareholders;

(c)     defendant O'Rourke had previously worked in Honig's offices, had a history of investing alongside Honig, had financial dealings with Honig, and had regularly consulted with Honig regarding the Company's business and affairs, including the decision to call the Company a "blockchain" company despite its lack of a legitimate blockchain business so that Honig and other investors could sell their Riot shares at artificially inflated prices;

(d)     Riot had paid approximately $11.9 million in preferred stock for Bitcoin mining equipment worth only $2 million from Kairos Global Technology, Inc. ("Kairos"), a newly formed entity with close ties to Company insiders; and

(e)     as a result of (a)-(d) above, the Company was subject to undisclosed legal, financial and reputational risks.

29.     The statements alleged to be materially false and misleading in ¶28 remained alive in the market and uncorrected at the start of the Class Period.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

30.     The Class Period begins on November 13, 2017.  On that date, the Company filed a financial report for the quarter ended September 30, 2017 on Form 10-Q.  Defendants O'Rourke and McGonegal signed the Form 10-Q and certified that the statements therein were accurate, not materially misleading and free from fraud.  The Form 10-Q stated that Riot's principal executive offices remained at Castle Rock, Colorado.  It also portrayed the Company as a legitimate blockchain business that allowed investors to seek exposure to rapidly rising cryptocurrency markets, but without the risks of being exposed to any one particular cryptocurrency.  For example, the Form 10-Q stated that "the Company's early emergence as a publicly traded company in which ***holders of appreciated cryptocurrency have an opportunity to invest inflated cryptocurrency profits for shares of the Company, which could be perceived as a way to maintaining investing exposure to the blockchain and cryptocurrency markets without exposing the investor to the risk in a particular cryptocurrency***."  The Form 10-Q also stated that cryptocurrency holders had "***realized exponential value***" and could "***lock in***" that price appreciation by purchasing the Company's securities.  The Form 10-Q stated, in pertinent part:

> *The price of the Company's shares could be subject to wide price swings since the value of cryptocurrencies may be subject to pricing risk and have historically been subject to wide swings in value.*

The Company's shares are subject to arbitrary pricing factors that are not necessarily associated with traditional factors that influence stock prices or the value of non-cryptocurrency assets such as revenue, cashflows, profitability, growth prospects or business activity levels since the value and price, as determined by the investing public, may be influenced by future anticipated adoption or appreciation in value of cryptocurrencies or the blockchain generally, factors over which the Company has little or no influence or control. The Company's share prices may also be subject to pricing volatility due to supply and demand factors associated with few or limited public company options for investment in the segment, which may benefit the Company in the near term and change over time.

Cryptocurrency market prices are determined primarily using data from various exchanges, over-the-counter markets, and derivative platforms. Furthermore, such prices may be subject to factors such as those that impact commodities, more so than business activities, which could be subjected to additional influence from fraudulent or illegitimate actors, real or perceived scarcity, and political, economic, regulatory or other conditions. Pricing may be the result of, and may continue to result in, speculation regarding future appreciation in the value of cryptocurrencies, or the Company or its share price, inflating and making their market prices more volatile or creating "bubble" type risks.

In addition, the success of the Company, the Company's share price, and the interest in investors and the public in the Company *as an early entrant into the blockchain and cryptocurrency ecosystem may in large part be the result of the Company's early emergence as a publicly traded company in which holders of appreciated cryptocurrency have an opportunity to invest inflated cryptocurrency profits for shares of the Company, which could be perceived as a way to maintaining investing exposure to the blockchain and cryptocurrency markets without exposing the investor to the risk in a particular cryptocurrency. Cryptocurrency holders have realized exponential value due to large increases in the prices of cryptocurrencies and may seek to lock in cryptocurrency appreciation, which investing in the Company's securities may be perceived as a way to achieve that result, but may not continue in the future.* As a result, the value of the Company's securities, and the value of cryptocurrencies generally may be more likely to fluctuate due to changing investor confidence in future appreciation (or depreciation) in market prices, profits from related or unrelated investments or holdings of cryptocurrency. Such factors or events would have a material adverse effect on the ability of the Company to continue as a going concern or to pursue this segment at all, or on the price of the Company's securities, which would have a material adverse effect on the business, prospects or operations of the Company and potentially the value of any cryptocurrencies the Company holds or expects to acquire for its own account.

31.     On November 15, 2017, Riot issued a press release announcing that O'Rourke had been featured in multiple technology segments on *ZDNet's TechRepublic* produced by *CBS Interactive*.  The press release contained links to the interviews wherein O'Rourke was presented as an expert on blockchain technologies.  During one of the interviews, entitled "Blockchain 101," O'Rourke stated: "The blockchain technology itself has potentially infinite uses and use cases" that have the potential to disrupt ubiquitous segments of the economy, such as banking.

32.     On November 16, 2017, Riot issued a press release announcing that it had invested in Verady, LLC, which purportedly provides accounting, audit and verification services for blockchain-based assets, such as cryptocurrencies.  O'Rourke was quoted in the press release as tying the Company's fortunes to the rise in the price of Bitcoin, stating, "'***With recent highs in Bitcoin and other cryptocurrency valuations, there is significant market potential for blockchain and digital asset technologies***.  We will continue to increase our involvement and support of the blockchain ecosystem, as we ramp up our Bitcoin mining operations.'"

33.     Indeed, as the price of Bitcoin and other cryptocurrencies skyrocketed in November and December 2017, the price of Riot stock rose in tandem.  From October 3, 2017 – the day before the Company announced it was appending "blockchain" to its name – to December 19, 2017, the price of the Company's shares had increased ***over 377%*** to close at $38.60 per share.

34.     On December 12, 2017, the Company announced the date of its annual meeting of shareholders in a Form DEF 14A filed with the SEC.  The filing stated that the meeting would be held on December 28, 2017, at the Boca Raton Resort and Club, 501 East Camino Real, Boca Raton, Florida 33422.

35.     Notably, Honig lives and works a short distance from this hotel.  The Company's prior shareholder meetings were held in Denver, Colorado, near Riot's ostensible headquarters.

36.     On December 21, 2017, Riot issued a press release announcing that its director Jason Les ("Les") had been featured in an interview regarding cryptocurrency with *ABC7 News* in San Francisco.  The release provided a link to the interview segment.  The introduction to Les's interview stated that the price of Bitcoin had increased in value from $1,000 to $19,000 over the course of the year and plugged Riot as a company specializing in blockchain technologies.  In the course of the interview, Les stated that "Bitcoin is gaining adoption rapidly now" for use as a currency, with the ultimate goal of replacing the U.S. dollar.  Les ended his interview by responding to a question about whether investors should "get in on this" cryptocurrency craze, stating: "***If they think that's something valuable then yeah they should invest some money, what their comfortable with, and see what happens, it has seen meteoric rises***."  He then compared the value proposition of blockchain-related companies to the early days of Facebook, stating that the difference was that anyone could invest in blockchain companies at the outset because it was an open system.

37.     The statements referenced in ¶¶30-32, 34 and 36 were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

        (a)     the Company had changed its name to Riot Blockchain, Inc. to generate investor enthusiasm and tie the Company to the recent rise in the price of cryptocurrencies, such as Bitcoin, but the Company lacked the requisite infrastructure, fundamental business or expertise of a legitimate blockchain company or significant asset exposure to cryptocurrency markets, in order to

further an insider scheme that would allow Honig and his associates to sell their Riot securities at artificially inflated prices;

(b)    Honig and other investors were effectively controlling the Company and its operations and exerting undisclosed influence over the Company's business and affairs from Honig's Florida offices to further their own interests rather than the interests of the Company's outside shareholders;

(c)    defendant O'Rourke had previously worked in Honig's offices, had a history of investing alongside Honig, had financial dealings with Honig, and had regularly consulted with Honig regarding the Company's business and affairs, including the decision to call the Company a "blockchain" company despite its lack of a legitimate blockchain business so that Honig and other investors could sell their Riot shares at artificially inflated prices;

(d)    Riot had paid approximately $11.9 million in preferred stock for Bitcoin mining equipment worth only $2 million from Kairos, a newly formed entity with close ties to Company insiders; and

(e)    as a result of (a)-(d) above, the Company was subject to undisclosed legal, financial and reputational risks.

38.    On December 27, 2017, Riot issued a press release announcing that it had adjourned its annual meeting of stockholders until February 1, 2018.  On this news, the price of the Company stock declined from $31.22 per share on December 26, 2017, to close at $27.23 per share on December 28, 2017, a decline of nearly 13% over two trading days.

39.    On December 29, 2017, Riot filed a Form 4 with the SEC disclosing that O'Rourke had sold 19,583 shares of Riot stock at $28.45 per share and an additional 10,800 shares through

ATG Capital LLC at $28.90 per share for total gross proceeds of nearly $870,000. This represented almost 37% of the Riot shares held by O'Rourke and ATG Capital LLC. The disclosure also occurred on a Friday evening right before a holiday weekend in an apparent attempt to minimize scrutiny of the sale. Nevertheless, on the disclosure that the Company's CEO was selling a large portion of his personal shares, the price of Riot stock declined over the next two trading days to close at $24.36 per share on January 3, 2018, a decline of over 14% from the closing price on December 29, 2017.

40.     On January 5, 2018, the Company filed a notification on Form 8-K revealing that it had dismissed its auditor, EisnerAmper LLP. On January 9, 2018, investor news site *The Motley Fool* published an article entitled "Riot Blockchain: This Crypto Clown Car Continues Hurtling Toward the Abyss." The article publicized the auditor's dismissal and connected it to the removal of two other auditors by Riot earlier in the year, which raised concerns about corporate governance and the legitimacy of the Company's business. On this news, the price of Riot shares once again declined, from a close of $24.43 per share on January 5, 2018 to a close of $20.85 per share on January 11, 2018, a decline of $3.58 per share, or nearly 15%, over four trading days.

41.     On February 12, 2018, Honig reported that his share ownership had dropped to approximately 173,000 shares, or less than 1.5% of the Company's outstanding shares as of January 4, 2018. That same day, his brother Jonathan Honig reported that his own share count had dropped to approximately 201,000 shares, or only 1.7% of shares outstanding as of January 4, 2018. Similarly, on February 15, 2018, Groussman reported that he owned only approximately 189,000 Riot shares, or only about 1.62% of the Company's outstanding shares as of December 31, 2017. Thus, these three shareholders, who had once collectively owned nearly 30% of the Company's

common stock, either directly or indirectly, had almost completely exited their positions at the exact time the Company's share price was at or near all-time highs.

42.     Finally, on February 16, 2018, *CNBC* published an article, entitled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket," regarding questionable practices at Riot.  The article revealed, among other things, that: (i) Honig appeared to be "***the man behind the . . . curtain***" at Riot; (ii) Honig and other insiders had sold large amounts of Riot shares at times that coincided with increases in Riot's stock price; (iii) O'Rourke had a history of dealings with Honig and regularly consulted with him regarding the Company's affairs; and (iv) Riot had overpaid for Bitcoin mining machines from a less-than-two-week-old entity that appeared to have numerous ties to Company insiders.  The article stated in pertinent part:

> As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis.  Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.
>
> ***But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease***.
>
> That might sound somewhat like the type of newly minted blockchain company that has gained SEC attention.
>
> "***Nobody should think it is OK to change your name to something that involves blockchain when you have no real underlying blockchain business plan and try to sell securities based on the hype around blockchain,*** " SEC Chairman Jay Clayton said, speaking in generalities in recent testimony to Congress.  ***The SEC declined to comment to CNBC about Riot Blockchain***.
>
> The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.
>
> That purchase and the company's name change aren't Riot's only questionable moves.

*A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.*

*Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida.* The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

*But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.*

Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.

*That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton. That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel. He once owned more than 11 percent of the outstanding common stock, according to SEC filings.*

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone. "It was an investment where I had a return. And I sold some shares. There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

From the outside, Honig's office is nondescript.  There does not appear to be any evidence of his company's existence on the building's directory or on the door of his office.

*        *        *

**When CNBC crew members walked into the office, they didn't find Honig, they found CEO of Riot Blockchain, John O'Rourke**.  That's the same O'Rourke who made headlines when – less than three months after the company changed names and business plans – he sold about $869,000 worth of shares, according to an SEC filing.  He told the crew he was there for a meeting with Honig and that we had just missed him.

O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed."  Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

He agreed to answer questions via email instead. One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

"I have my own office in a separate location," O'Rourke said in an email sent by his lawyer, Nick Morgan, a partner with Paul Hastings.  "I do have a good relationship with Mr. Honig and we speak often."

"John O'Rourke does not work out of my office," Honig said.  "John O'Rourke has his own office . . . at one time John O'Rourke had space in my office . . . we speak often."

**Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information**.

"**You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or**

- 18 -

*dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.*

Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.

"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

"*I see a company that has had a change of control of the board. I see a company that has had a change in business. I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said. "And what I understand [is] a significant amount of insider selling. So yes, these are red flags*."

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million. On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent. After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants. His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017. Honig's investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28. At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

*But that may not be the true extent of Honig's selling. Buried deep in the footnotes of Riot filings, it's clear Honig also accumulated more than 700,000 new warrants that he could convert to stock at $3.56 per share and more than 700,000 promissory notes that he could convert to stock at $2.50 a share.*

*What about those warrants and promissory notes? It's not clear, as he never mentioned them in either 13D. But in another footnote from a recent Riot filing, there is no longer a mention of them.*

He declined to further clarify what happened to them.

"It's all disclosed in the public filings. And those are all the obligations I have," he said. "I'm very comfortable with what I had to do and what I was obligated to do. . . . I'm not going to talk about my personal trading history or my bank account."

*Birns questioned how Honig made his filings. "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock. Or has the potential to own [a] significant amount of stock in excess of what is reported on the 13D," he said.*

This is not the first time Honig has faced questions over his actions. In 2000, he was alleged to have committed stock manipulation. Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.

When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

*One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase.  Kairos' main asset was $2 million of mining equipment.  Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.*

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

*Kairos appears to have many links to Riot*.  The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada.  Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining.  SEC filings are silent on mining activity.

As for professional poker players advising Riot?  O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers.  He called them "thought leaders."

*Riot is not O'Rourke and Honig's first cryptocurrency investment*.

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

- 21 -

At the time, WPCS was a communications, infrastructure and contracting company.  The stock went up to $435.60 on a split-adjusted basis.  It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor.   "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said.  "I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."

Honig acknowledges the investment.

The questions continue for Riot Blockchain.

On Tuesday, Riot filed to withdraw prior SEC filings.

"It is not the result of any government inquiry," O'Rourke said in an email. "It was just corporate clean up from our securities counsel."

As for the annual shareholders' meeting, "We did not have a quorum of shareholders required for a vote," O'Rourke said in the email from his lawyer.  "We are also working on other corporate action items that would require shareholder approval and a shareholder meeting as well.  We did not want to waste the time and expense of potentially having two shareholder meetings within a short period of time. Thus we adjourned the meetings, which is not an uncommon practice."

There is no new date for the shareholders' meeting.

"You see companies adjourn meetings in a context of a contested election and the like," Birns said.  "I just don't think in this instance, there's any reason to adjourn their annual meeting."

43.     On this news, the price of the Company's shares fell $5.74 per share, or 33%, to close at $11.46 per share on February 16, 2018.

44.     While Riot's investors during the Class Period have lost tens of millions of dollars as a result of the revelations of defendants' fraud and the consequent decline in the price of Riot stock, Honig and his cohorts, including O'Rourke, have profited from the scheme.  As Honig characterized

his Riot investment in an interview with *The Denver Post*: "'Myself, being involved as an early

shareholder, people who followed me, ***they've benefited***.'"

### LOSS CAUSATION AND ECONOMIC LOSS

45.     During the Class Period, as detailed herein, defendants engaged in a scheme to

deceive the market and a course of conduct that artificially inflated the prices of Riot securities and

operated as a fraud or deceit on purchasers of Riot securities.  As detailed above, when the truth

about Riot's misconduct was revealed, the value of the Company's securities declined precipitously

as the prior artificial inflation no longer propped up the securities' prices.  The declines in the prices

for Riot securities were the direct result of the nature and extent of defendants' fraud finally being

revealed to investors and the market.  The timing and magnitude of the share price declines negate

any inference that the loss suffered by plaintiff and other members of the Class was caused by

changed market conditions, macroeconomic or industry factors or Company specific facts unrelated

to the defendants' fraudulent conduct.  The economic loss, *i.e*., damages, suffered by plaintiff and

other Class members, was a direct result of defendants' fraudulent scheme to artificially inflate the

price of the Company's securities and the subsequent significant decline in the value of the

Company's securities when defendants' prior misrepresentations and other fraudulent conduct were

revealed.

46.     At all relevant times, defendants' materially false and misleading statements or

omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other

Class members.  Those statements were materially false and misleading through their failure to

disclose a true and accurate picture of Riot's business, operations and financial condition, as alleged

herein.  Throughout the Class Period, defendants issued materially false and misleading statements

and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of Riot's securities to be artificially inflated. Plaintiff and other Class members purchased Riot securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

47.     At all relevant times, the markets for Riot securities were efficient markets for the following reasons, among others:

(a)     Riot stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     according to the Company's Form 10-Q, filed on November 13, 2017, the Company had approximately 8.3 million common shares outstanding as of the date of the filing, demonstrating a very active and broad market for Riot securities;

(c)     as a regulated issuer, Riot filed periodic public reports with the SEC;

(d)     Riot regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases and investor presentations on the national circuits of major newswire services, via the Internet and through other wide-ranging public disclosures; and

(e)     unexpected material news about Riot was rapidly reflected in and incorporated into the prices of the Company's securities during the Class Period.

48.     As a result of the foregoing, the markets for Riot securities promptly digested current information regarding Riot from publicly available sources and reflected such information in the prices of Riot securities. Under these circumstances, all purchasers of Riot securities during the

Class Period suffered similar injury through their purchase of Riot securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

49.     Defendants' false or misleading statements during the Class Period were not forward-looking statements ("FLS"), or were not identified as such by defendants, and thus did not fall within any "Safe Harbor."

50.     Riot's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

51.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Riot who knew that the FLS was false. Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action on behalf of all purchasers of Riot securities during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are the defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Riot common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Riot or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  These shares are likely held by hundreds or thousands of individuals located geographically throughout the country.  Joinder would be highly impracticable.

54.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

55.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)     whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)      whether the prices of Riot securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(d)      whether the members of the Class have sustained damages and, if so, the proper measure of damages.

57.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against Riot, O'Rourke and McGonegal

58.      Plaintiff incorporates the foregoing paragraphs by reference.

59.      During the Class Period, defendants Riot, O'Rourke and McGonegal disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60.      Defendants Riot, O'Rourke and McGonegal violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Riot securities during the Class Period.

61.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Riot securities.  Plaintiff and the Class would not have purchased Riot securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

62.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Riot securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

63.     Plaintiff incorporates the foregoing paragraphs by reference.

64.     During the Class Period, defendants acted as controlling persons of Riot within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Riot, the Individual Defendants had the power and ability to control the actions of Riot and its employees.   Riot controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead

Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil

Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding plaintiff and the members of the Class damages and interest;

C.      Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 22, 2018                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                             JACK REISE, Florida Bar No. 058149
                                             ROBERT J. ROBBINS, Florida Bar No. 0572233


                                             ROBERT J. ROBBINS

                                             120 East Palmetto Park Road, Suite 500
                                             Boca Raton, FL  33432
                                             Telephone:  561/750-3000
                                             561/750-3364 (fax)
                                             jreise@rgrdlaw.com
                                             rrobbins@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID C. WALTON
LUCAS F. OLTS
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
davew@rgrdlaw.com
lolts@rgrdlaw.com
bcochran@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  770/200-3104
770/200-3101 (fax)
michaelf@johnsonfistel.com

Attorneys for Plaintiff